NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2424-25

PHILLIPSBURG HOUSING
AUTHORITY,

    Plaintiff-Respondent,

v.

ZALAYAH HUNT,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

July 23, 2026

APPELLATE DIVISION

Argued June 8, 2026 – Decided July 23, 2026

Before Judges Sumners, Susswein and Chase.

On appeal from the Superior Court of New Jersey,
Law Division, Warren County, Docket No.
LT-000666-25.

Zalayah Hunt, appellant, argued the cause on
appellant's behalf.

David Fiori, III argued the cause for respondent
(Florio, Perrucci, Steinhardt, Cappelli & Tipton, LLC,
attorneys; David Fiori, III, of counsel and on the
brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

This case raises novel questions under the New Jersey Anti-Eviction Act (the Act), N.J.S.A. 2A:18-61.1 to -61.12, concerning the enforceability of a settlement agreement that purports to place a tenant "on probation." By leave granted on her emergent application, self-represented defendant Zalayah Hunt appeals the March 19, 2026[1] Special Civil Part order enforcing a previously issued judgment for possession to plaintiff Phillipsburg Housing Authority (PHA) and a warrant for her removal from the apartment she shares with her four-year-old daughter.

The dispute between PHA and Ms. Hunt has been simmering for several years. It culminated in PHA's September 2025 dispossess action to address its longstanding frustration with what it deemed to be her recurring procrastination and lack of cooperation with its efforts to conduct annual and interim reexaminations of her eligibility for federal housing assistance. In November 2025, the parties executed a settlement that incorporated a "probation agreement" (Probation Agreement). The legal efficacy and enforceability of that agreement is at the heart of this appeal.

---

[1] The order was initially issued on March 18 but the court sua sponte issued a revised order on March 19 to correct the erroneous inclusion of inapposite text.

A-2424-25

Ms. Hunt has been a tenant with PHA since December 2021, and has been on "zero-income" status[2] since at least October 1, 2023. The federal subsidy program requires annual recertification of a tenant's eligibility based on income and other financial documentation. As part of that process, a public housing authority is required under federal law to convene periodic interviews during which a subsidized tenant provides information and supporting documentation. The record shows that over the course of the five-and-a-half-year-old tenancy, there have been a number of disputes between PHA and Ms. Hunt regarding her obligation—under the lease and PHA rules—to meet in person with PHA staff to provide information and documents. The dispossess complaint alleges that in 2025, as in prior years, she failed to keep interview appointments and provide certain documents PHA needed to confirm that she was still eligible for zero-income assistance. That was the straw that broke the camel's back, prompting PHA to file an eviction complaint in September 2025.

In November 2025, the parties agreed to a settlement that placed Ms. Hunt "on probation" for a six-month term. The Probation Agreement provides in pertinent part that during the probationary term, she must, as a condition of

---

[2] The zero-income subsidy program is administered by the United States Department of Housing and Urban Development (HUD) and provides financial assistance to eligible low-income tenants. HUD provides federal aid to local housing authorities, like PHA, which use those funds to manage the housing for low-income tenants.

probation, "attend all required [PHA] meetings" and "provide a reason" if she needs to reschedule. The agreement further provides that "[i]f tenant fails to comply with the above provisions," PHA "may file a certification of breach with the court, on notice to the Tenant. The court may then enter a [j]udgment for [p]ossession and a [w]arrant of [r]emoval may issue." The agreement additionally states that "[n]o [j]udgment for possession shall enter in this matter, unless and until the tenant fails to comply with the probationary terms of this agreement," suggesting that failure to comply would be a basis upon which the court might order her removal. The agreement makes no mention of Ms. Hunt's alleged prior failures to attend meetings and provide required documents, or whether those failures constitute good cause for eviction under the Act.

A threshold question before us is whether and in what circumstances a landlord and tenant can agree that noncompliance with the terms of a probation agreement constitutes sufficient grounds and good cause to evict under the Act. This question raises important policy considerations because a so-called probation agreement can be beneficial to both parties; it serves a housing authority's interests by inducing the tenant to henceforward comply with its rules, while providing a tenant who otherwise might be subject to immediate eviction a last chance to salvage the tenancy. We must address these policy

A-2424-25

considerations, however, without the benefit of explicit legislative instruction. Other than a reference to criminal law probation not relevant here,[3] the text of the Act makes no mention of "probation" or a "probationary term." Nor do any published cases expressly address the validity and enforceability of a landlord-tenant probation agreement.

PHA contends that Ms. Hunt breached the Probation Agreement through what it characterizes as a pattern of noncompliance. The trial court agreed, and on that basis entered a judgment for possession and warrant for removal, as purportedly authorized by the agreement. After reviewing the record in light of the governing legal principles, on these distinctive facts, we reverse and vacate the judgment for possession and warrant of removal. We do so for two independent reasons.

First, we emphasize that while a landlord and tenant are free to enter into a settlement that imposes conditions regarding future conduct, as a matter of law and public policy, any such probation agreement cannot authorize an eviction unless that remedy is authorized by the Act. The Act contains two features that are critical to our analysis. First, it provides that a landlord cannot remove a residential tenant "except upon establishment of one of the [statutorily enumerated] grounds as good cause." N.J.S.A. 2A:18-61.1.

---

[3] See N.J.S.A. 2A:18-61.1 (n), (p).

A-2424-25

Second, and to underscore the importance of the good cause prerequisite, the Act expressly precludes a landlord and tenant from agreeing to waive the good cause standard, stating, "Any provision in a lease whereby [a covered tenant] agrees that [their] tenancy may be terminated or not renewed for other than good cause as defined in [the Act] . . . shall be deemed against public policy and unenforceable." N.J.S.A. 2A:18-61.4.

We read these two provisions together as establishing an absolute rule that precludes a court from entering a judgment for possession or issuing a warrant for removal unless there has been a judicial finding of good cause based on one of the enumerated grounds for eviction set forth in the Act. In a contested case, that critical finding can be established in either of two ways: the court may find grounds for eviction after a trial, or the tenant may admit to the ground(s) for eviction and good cause as part of a consent judgment or settlement agreement. See Pine Ridge Realty Assocs., LLC v. A.O., 483 N.J. Super. 487, 493 (App. Div. 2026) (reaffirming that a judgment for possession "may only be entered in three ways:" (1) "by default judgment, [R.] 6:6-3[(b)];" (2) "by consent, [R.] 6:6-4;" or (3) "by the court after a trial, [R.] 6:6-5"). Stated another way, while the good cause requirement is unalienable and cannot be waived by agreement, the parties can agree that the good cause threshold has been satisfied. At bottom, the Act guarantees that in a contested

A-2424-25

landlord-tenant case, at some point before a Sheriff comes knocking to execute a court-issued warrant of removal, a neutral and detached judge must find by competent evidence, or by accepting a voluntary admission by the tenant, that the tenant committed the violation(s) alleged by the landlord and that those violation(s) are eviction-worthy under the Act.

In this instance, there has been no such judicial finding or acknowledgement by the tenant of good cause as to authorize an eviction. So far as the record before us shows,[4] the trial court never found that Ms. Hunt's violations were "substantial"—a required element of both statutory grounds for eviction cited in PHA's eviction complaint. Indeed, PHA acknowledged at oral argument that the issue of whether the alleged breaches were substantial for purposes of the Act was not raised before the trial court.

As to the alternate means for establishing the lawful basis for eviction— a voluntary admission by the tenant that good cause exists—it is clear that Ms. Hunt never agreed or admitted that her conduct amounted to a substantial violation of the lease or that there was good cause to evict by reason of any such substantial violation. Notably, the parties' settlement agreement did not include an affidavit by PHA "stat[ing] the facts establishing the jurisdictional

---

[4] A hearing was held on March 18, but the hearing transcript is not in the record on appeal because Ms. Hunt's request for the transcript at public expense was denied. See R. 2:5-3(d)(3).

good cause for eviction" as required by Rules 6:6-4 and 6:6-3(b). Nor does it include an admission by Ms. Hunt that good cause exists to justify her eviction.

We hold as a matter of law that in the absence of either a judicial finding or a tenant's voluntary admission that the alleged conduct constitutes a violation that amounts to good cause to evict, a settlement agreement, regardless of its label, cannot enlarge the list of authorized grounds for eviction, excuse the need for the landlord to establish all of the material elements of at least one such enumerated ground, shift the burden of proof from the landlord to the tenant, delegate to the landlord the unilateral authority to decide whether a breach of the settlement agreement occurred that warrants the remedy of eviction, or otherwise weaken or displace the good cause and substantial violation prerequisites set forth in the Act. The point simply is that when, as in this case, the parties dispute the enforceability of a probation agreement, a tenant's post-agreement noncompliance cannot support an eviction unless the trial court finds, based on the totality of relevant circumstances—i.e., the tenant's conduct before and/or after the agreement— that the landlord has established a statutory ground for eviction and good cause. That did not happen here.

A-2424-25

Our second reason for vacating the eviction is that even were we to assume for the sake of argument that Ms. Hunt substantially violated her obligations under the lease and/or Probation Agreement with respect to the latest round of reexamination interview appointments and document requests, she was denied an opportunity to cure the noncompliance prior to enforcement of the judgment for possession and warrant of removal. As we explain, this is not one of those situations recognized in the case law where a cure is unavailing because it comes too late and the harm is done. While the circumstances in this case are not directly addressed in any published precedent cited to us, applying the spirit if not the letter of the limitations on what a landlord and tenant can agree to, set forth in N.J.S.A. 2A:18-61.4, we do not accept the notion that Ms. Hunt impliedly waived the opportunity afforded under the Act to cure a violation just because she entered into the Probation Agreement and a violation occurred thereafter. Here, the record indicates that she was prepared to meet with PHA staff and provide the documents it requested as of February 18, 2026—a month before the March 18, 2026 order to show cause hearing. But PHA declined to meet with her and refused to accept her outstanding documents. Although we do not agree with Ms. Hunt's contention that PHA acted in bad faith, we conclude that in these distinctive circumstances, she should have been permitted to cure the violation.

9

# I.

## Facts and Procedural History

We discern the following pertinent facts and procedural history from the record.

## The Lease and Applicable Policies

Ms. Hunt has been a "zero-income" tenant with PHA since at least October 1, 2023, paying the minimum PHA rent of $50 per month. Her zero-income housing is subsidized by HUD, and PHA administers the public housing through its contractual relationship with HUD. See 42 U.S.C. § 1437a(b)(1).

Ms. Hunt's lease requires her to recertify her zero-income status each year. Specifically, the lease provides that once a year, the tenant will "submit a signed application for continued occupancy [and] furnish accurate information to [PHA] as to family income, employment and composition, for use by [PHA] in determining whether . . . [the] tenant is still eligible for low rent housing."

The lease also requires Ms. Hunt to report "[a]ny increase or decrease in family income" to PHA "immediately (within 10 days)." The lease provides:

> If . . . the tenant has misrepresented to [PHA] the facts upon which his rent is based or it is found that the tenant has failed to report to [PHA] any specified change in family circumstances which would warrant

10

a rental increase in accordance with [f]ederal rules and regulations so that the rent he is paying is less than he should have been charged . . . [PHA] may institute dispossess proceeding[s] because of said misrepresentation.

In the same section, the lease also incorporates by reference applicable federal rules and regulations,[5] as well as PHA's "Admission and Continued Occupancy Policy" (ACOP). The ACOP, in turn, contains requirements governing both annual and interim reexaminations for tenants paying income-based rent. Section 9-I.B of the ACOP ("Scheduling Annual Reexaminations") provides, in relevant part:

> Families generally are required to participate in an annual reexamination interview.
>
> . . . .
>
> If the family is unable to attend a scheduled interview, the family should contact the PHA in advance of the interview to schedule a new appointment. In all circumstances, if a family does not attend the scheduled interview the PHA will send a second notification with a new interview appointment time.

---

[5] 24 C.F.R. § 960.259(a)(2) states, "[t]he family must supply any information requested by the PHA or HUD for use in a regularly scheduled reexamination or an interim reexamination of family income and composition in accordance with HUD requirements." 24 C.F.R. § 960.257 requires PHA to conduct an annual income reexamination, as well as an interim reexamination if PHA "becomes aware that the family's adjusted income . . . has changed by an amount that [PHA] estimates will result in an increase of ten percent or more in annual adjusted income."

> If a family fails to attend two scheduled interviews without PHA approval, the family will be in violation of their lease and may be terminated in accordance with the policies in Chapter 13.

A different section of the ACOP—Section 9-III.C ("Changes Affecting Income or Expenses")—provides for interim reexaminations. Specifically, if a family has reported zero income, "the PHA will conduct an interim reexamination every three months as long as the family continues to report that they have no income." ACOP also provides:

> Generally, the family will not be required to attend an interview for an interim reexamination. However, if the PHA determines that an interview is warranted, the family may be required to attend.

Pursuant to this provision, Ms. Hunt was required to attend a "zero-income review appointment" every ninety days and to submit documentation supporting her continued zero-income status.

Additionally, Section 13-III.C ("Other Authorized Reasons for Termination") provides that the PHA

> will terminate the lease for the following reasons.
>
> . . . .
>
> Failure to furnish such information and certifications regarding family composition and income as may be necessary for the PHA to make determinations with respect to rent, eligibility, and the appropriateness of the dwelling unit size.

## Alleged Lease Violations

PHA asserts that throughout the course of her tenancy, Ms. Hunt has repeatedly failed to report changes in income, provide required income documentation, and attend scheduled reexamination meetings. PHA issued various notices to cease and quit to her in 2022, 2024, and 2025 before filing an eviction complaint in September 2025.

Sometime around November 2022, Ms. Hunt allegedly "failed to report [her] employment at Ulta Salon Cosmetics Fragrance/Ulta Beauty," as required under the lease. PHA issued a November 29, 2022 notice to cease and a December 21, 2022 notice to quit. The record does not indicate how or whether this issue was resolved. It is not disputed, however, that PHA renewed the tenancy.

The record does not indicate there were any problems in 2023. Problems relating to missed or rescheduled appointments resurfaced in 2024. According to PHA's certifications submitted to the trial court, Ms. Hunt was scheduled for an appointment on February 14, 2024, and after several rescheduled and missed meetings, she eventually attended on March 25, 2024. She was scheduled for another appointment on April 29, 2024, which was rescheduled several times, missed once, and eventually occurred on May 9, 2024. On July 15, 2024, PHA issued a notice to cease, alleging that Ms. Hunt "failed to

appear on three different occasions for [her] [ninety]-day [z]ero [i]ncome review appointment and provide copies of the required documents as requested by July 10, 2024, with extensions given to July 11, 2024, and July 15, 2024." PHA's certifications state that "this pattern of behavior has been continuous throughout [Ms. Hunt]'s tenancy," but do not provide further specific examples. However, once again, the record indicates that she remained a tenant with PHA, and it is not disputed that PHA continued to receive subsidy payments from HUD.

That brings us to 2025. In February and March 2025, Ms. Hunt allegedly failed to provide several requested documents: (1) verification that she "did not work at Ralph Lauren," which was allegedly requested by February 10, 2025 and extended several times until April 1, 2025; (2) a notarized statement describing a period in which she was not living in her unit and the reason for her absence; and (3) two recent financial statements. PHA issued a February 26, 2025 notice to cease, a March 11, 2025 notice to quit, a March 18, 2025 notice to cease, an April 17, 2025 notice to quit, and a May 6, 2025 notice to quit.

Grievance Hearings, Eviction Action, and Settlement/Probation Agreement

Ms. Hunt challenged the May 6, 2025 notice to quit, and in accordance with PHA policy, an informal grievance hearing was held on June 19, 2025.

14                                                                    A-2424-25

PHA's summary of that hearing stated: "[Ms. Hunt] stated no excuse for why she did not provide [the requested documents] as required per PHA policy. A lot of times it was because she was procrastinating, and it caused more problems than she thought it would." PHA decided to uphold the notice to quit.

Ms. Hunt then requested a formal grievance hearing, which was held on July 16, 2025. PHA's summary of that hearing stated that she "continued to provide no valid excuse" for not providing the requested documentation. The summary also noted that Ms. Hunt "has claimed that she has not been able to check her mail for notices because she has been in Newark helping her ill aunt." Finally, the summary stated that as of the date of the hearing, she "has failed to provide information required to fulfill her zero income certification requirement (every 90 days)." PHA again decided to uphold the notice to quit, and provided the following additional statement of reasons:

> While the current [n]otice to [q]uit dated May 6, 2025, reflects a limited scope, there is a four-and-a-half-year history of failure to provide and/or report required information in a timely manner. The amount of time it takes the PHA to process changes for the account is drastically longer than the average due to the number of requests and [l]ease actions trying to gather the information needed for the change.

On September 3, 2025, PHA filed an eviction complaint against Ms. Hunt, citing two grounds for eviction specified in the Act, N.J.S.A. 2A:18-

61.1(d) (continued, substantial violation of landlord's rules and regulations) and N.J.S.A. 2A:18-61-1(e) (continued, substantial violation of covenants or agreements in the lease). A hearing was scheduled for November 14, 2025. That day, PHA and Ms. Hunt, represented by counsel, entered into a settlement agreement and the Probation Agreement attached to it which is at the crux of this appeal. The settlement agreement provided:

> No [j]udgment for [p]ossession is entered. The parties understand that if the tenant breaches this agreement, the landlord may file a certification of breach with the court, on notice to the [t]enant. The court may then enter a [j]udgment for [p]ossession and a [w]arrant of [r]emoval may issue.

The settlement agreement further provided that it would remain in force until tenant "satisfied the terms set forth" in the attached Probation Agreement.

The Probation Agreement provided, in relevant part:

> Tenant shall be placed on probation with the PHA for a period of six months from 11/14/2025 to 5/14/2026.

> During this probationary period, [t]enant agrees to comply with and attend all required meetings. In the event tenant needs to reschedule any meetings with the PHA required under tenant's lease, tenant must 1) communicate the fact that she must reschedule the appointment; 2) provide a reason for rescheduling, and 3) when possible, provide documentation supporting the reason given for the need to reschedule, which tenant shall make a good faith effort to attain.

16                                                          A-2424-25

If tenant fails to comply with the above provisions, the PHA may take steps to allege there was a breach of this agreement. Before filing any court paperwork, the PHA shall provide tenant with seven days['] notice of the alleged breach, in writing.

Upon the conclusion of the probationary period, this agreement shall no longer be enforceable, and the complaint shall be automatically dismissed on 5/31/2026.

No [j]udgment for possession shall enter in this matter, unless and until the tenant fails to comply with the probationary terms of this agreement.

While the settlement agreement—which used the model agreement found in an appendix to the Court Rules[6]—stated that a "Certification by Landlord and the Certification of Landlord's Attorney (if the Landlord has an attorney) are attached hereto," the record indicates that no such certifications were attached to the agreement.

Alleged Breaches of Probation Agreement

PHA claims that Ms. Hunt breached the Probation Agreement five times, by either failing to attend a required meeting or failing to provide a reason for rescheduling a meeting. Ms. Hunt contends that each alleged breach was either "manufactured" by PHA, de minimis, or not actually a breach based on her substantive, good faith compliance with the Probation Agreement.

---

[6] See Settlement Agreement (Tenant Remains), Pressler & Verniero, Current N.J. Court Rules, Appendix XI-V (2026).

A-2424-25

Ms. Hunt's first alleged breach was her failure to contact PHA by January 16, 2026, in order to schedule a meeting to provide her "Zero Income Checklist & Worksheet." The parties agree that she did not schedule this meeting by January 16, but dispute whether she had received a January 12 letter instructing her to schedule it. PHA contends that this letter was hand delivered to her apartment on January 12, and it submitted to the trial court: (1) a copy of the letter, (2) an affidavit from PHA employee Kashmir Beaton in which Beaton states that he delivered "Housing Authority mail" to Ms. Hunt on January 12 and (3) a copy of a completed PHA work order indicating that Beaton "[d]elivered all mail" that day. In her appeal brief, Ms. Hunt maintains that she was home all day on January 12, and the letter was never delivered.

On January 29, PHA sent Ms. Hunt a letter stating that she had failed to contact PHA by January 16, and also failed to return a signed and dated lease amendment that was due on January 19. The January 29 letter stated that if she failed to arrange and attend a meeting within seven days, PHA would file a certification of breach with the court. Ms. Hunt promptly contacted PHA and scheduled an appointment for January 30, at 3:00 p.m.

In the second alleged breach, Ms. Hunt contacted PHA at 1:13 p.m. on January 30 and asked to reschedule her 3:00 p.m. appointment to 4:00 p.m. Both parties agree that she ultimately appeared for this meeting at 4:30 p.m.

18

Before the January 30 meeting, Ms. Hunt emailed PHA and stated that she would be in Newark beginning on February 2 and most likely would not be back in Phillipsburg until February 16. At the January 30 meeting, however, she signed a form indicating that she would call PHA on February 2 to schedule an appointment for that same day. Then, immediately after the meeting, Ms. Hunt stated she was "not able to confirm [February 2] as an appointment." According to PHA, Ms. Hunt breached the Probation Agreement because she "failed to provide a reason for rescheduling" her presumptive February 2 appointment.

PHA then advised Ms. Hunt that she was required to schedule an appointment for February 3, 4, or 5, and she replied that she could meet on February 16, as indicated in her January 30 email. PHA contends that this response was a "failure to comply with required meetings" in breach of the Probation Agreement.

In response to her request for a February 16 meeting, PHA told Ms. Hunt that it could not meet that day (Presidents' Day) and informed her that her meeting would be February 17, at 8:30 a.m., ostensibly without confirming that this day and time was acceptable to her. Ms. Hunt failed to appear at this time, although she emailed and called PHA several times that day to try to

19

schedule a time to meet and complete her zero-income form. PHA contends her failure to appear at 8:30 a.m. was a breach of the Probation Agreement.

<u>Certification of Breach, Order to Show Cause, and this Appeal</u>

On February 18, 2026, PHA notified Ms. Hunt that it intended to certify her breach with the court and seek a judgment for possession. On February 27, PHA sent a letter and certification of breach to the court, requesting entry of a judgment for possession and warrant of removal. The court granted a judgment for possession on February 27, and a warrant of removal on March 3. On March 6, before the warrant of removal was executed, Ms. Hunt filed an application for an order to show cause. PHA filed opposition on March 9, and Ms. Hunt replied on March 10. On March 11, the court granted Ms. Hunt's application for an order to show cause and scheduled a return hearing for March 18. A hearing was held on March 18, but the hearing transcript is not in the record on appeal because Ms. Hunt's request for the transcript at public expense was denied. <u>See</u> <u>R.</u> 2:5-3(d)(3).[7]

---

[7] The Court Rules restrict the provision of transcripts at public expense to criminal or quasi-criminal appeals, Division of Child Protection and Permanency termination of parental rights cases, Title 9 abuse and neglect cases, certain adoptions, and involuntary civil commitments. <u>R.</u> 2:5-3(d)(3). Indigent appellants facing potential eviction do not qualify.

At the conclusion of the March 18 hearing, the court entered an order denying Ms. Hunt's application for an order to show cause and ordering enforcement of the judgment for possession and warrant of removal on March 30 at 9:00 a.m., "unless [Ms. Hunt] is able to post the entire amount of rent arrears due," in which case "[she] may stay the eviction." On March 19, the court entered an amended order that omitted the inapposite provision allowing her to stay the eviction by paying her rent arrears.[8]

On March 20, we granted permission for Ms. Hunt to file an emergent motion for leave to appeal, seeking an interim stay of the warrant of removal. She filed her motion on March 24 and PHA filed opposition on March 26. On March 30, we granted Ms. Hunt's motion for leave to appeal, specifically directing the parties to address the following question: "Is the breach of a 'probationary' settlement agreement a lawful basis for eviction under the Anti-Eviction Act, N.J.S.A. 2A:18-61.1, where the tenant purports to have cured the lease violations originally giving rise to the eviction action under N.J.S.A. 2A:18-61.1(d)?"

---

[8] The record indicates that there are no rent arrearages in this case.

A-2424-25

II.

Parties' Arguments

Because the parties raise numerous arguments and counterarguments in their appellate submissions, we reproduce verbatim the point headings from their respective briefs.

Ms. Hunt raises the following contentions for our consideration in her initial appeal brief:

POINT I

THE TRIAL COURT LACKED JURISDICTION TO ENTER JUDGMENT BECAUSE [PHA] WAIVED THE ALLEGED BREACH BY RETAINING MARCH RENT FOR EIGHTEEN DAYS.

POINT II

THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY ISSUING AN AMENDED ORDER SUA SPONTE WITHOUT NOTICE OR HEARING.

POINT III

THE TRIAL COURT ERRED BY ADOPTING [PHA]'S SELECTIVE ENFORCEMENT OF ADMINISTRATIVE POLICIES AND OVERLOOKING DOCUMENTED ACTS OF ADMINISTRATIVE SABOTAGE.

POINT IV

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO SCRUTINIZE [PHA]'S

ADMITTED OBSTRUCTION OF APPELLANT'S RIGHT TO CURE.

POINT V

THE TRIAL COURT'S RELIANCE ON "PUBLIC POLICY" TO UPHOLD A SETTLEMENT AGREEMENT REACHED THROUGH BAD-FAITH CONDUCT IS MISPLACED.

POINT VI

THE TRIAL COURT COMMITTED REVERSIBLE ERROR REGARDING STATUTORY PROTECTIONS.

POINT VII

THE JUDGMENT FOR POSSESSION CONSTITUTES A MANIFEST MISCARRIAGE OF JUSTICE, CAUSING IRREPARABLE HARM TO A VULNERABLE MINOR.

PHA responds:

POINT I

THE QUESTION POSED BY THE HONORABLE RONALD SUSSWEIN, J.A.D.

A. Appellant's Attempts to Comply After-The-Fact Were Not a Cure of the Underlying Lease Violations.

B. Appellant Was Required to Cure a Pattern of Non-Compliance and Failed.

C. Repeated Non-Compliance with Substantial Terms of a Landlord's Rules and Regulations Is a Lawful Basis for Eviction Under the Anti-Eviction Act.

## POINT II

APPELLANT'S EVICTION IS PROPER UNDER THE ENFORCEABLE PROBATION AGREEMENT AND THE ANTI-EVICTION ACT.

A. The Probationary Agreement Is a Binding Agreement.

B. Appellant Agreed to the Entry of a Judgment for Possession if She Breached the Agreement.

C. Enforcement of the Settlement Agreement is Supported by the Anti-Eviction Act.

D. The Trial Court Rejected Appellant's Purported Cure.

E. The Trial Court was Not Required to Validate Appellant's Purported Cure.

## POINT III

THE TRIAL COURT DID NOT LACK JURISDICTION UNDER THE DOCTRINE OF WAIVER.

## POINT IV

THE TRIAL COURT DID NOT VIOLATE ANY OF APPELLANT'S RIGHTS BY AMENDING ITS MARCH 18 ORDER.

## POINT V

THE TRIAL COURT PROPERLY SCRUTINIZED BOTH PARTIES' ACTIONS.

24

POINT VI

WHAT THE TRIAL COURT RELIED UPON IS NOT PRESENTLY UNDER REVIEW.

POINT VII

APPELLANT'S CONTENTIONS REGARDING "STATUTORY PROTECTIONS" ARE NOT UNDER REVIEW.

POINT VIII

THE INSTANT EVICTION IS NOT FOR "BUREAUCRATIC CONVENIENCE" IT IS TO ENFORCE COMPLIANCE WITH FEDERAL MANDATES.

Ms. Hunt asserts the following additional contentions in her reply brief:

POINT I

[PHA]'S RELIANCE ON MAYO[9] IS A FRAUD UPON THE RECORD AS THE PHA INTENTIONALLY OBSTRUCTED APPELLANT'S ATTEMPTS TO CURE PRIOR TO THE CERTIFICATION OF BREACH.

POINT II

THE DOCTRINE OF WAIVER APPLIES REGARDLESS OF THE LANDLORD'S INTENT; THE EIGHTEEN-DAY RETENTION OF MARCH RENT STRIPPED THE TRIAL COURT OF JURISDICTION.

---

[9] Housing and Redevelopment Authority of the Township of Franklin v. Mayo, 390 N.J. Super. 425 (App. Div. 2007).

25

POINT III

THE STATUTORY RIGHT TO CURE UNDER N.J.S.A. 2A:18-61.1(d) IS ABSOLUTE AND CANNOT BE CONTRACTED AWAY BY A PROBATIONARY AGREEMENT.

## III.

### General Principles

We begin our analysis by acknowledging certain basic legal principles that govern this appeal. As a general proposition, we apply a deferential standard in reviewing a trial court's factual findings in a bench trial. Balducci v. Cige, 240 N.J. 574, 595 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271 (2019). In an appeal from a non-jury trial, appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). Accordingly, reviewing courts "do not disturb the factual findings and legal conclusions of the trial judge unless [the reviewing courts] are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)) (internal quotation marks omitted). Of course, the deference we accord to a trial court's findings in a bench trial presupposes the

court made factual findings to support its legal conclusions, based on its assessment of the testimony and documentary evidence presented by the parties. See New Jersey Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342 (2010) ("[T]he trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980))).

Furthermore, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). This appeal hinges on an interpretation of the Act and the legal consequences that flow from the parties' decision to enter into the Probation Agreement. See G.G.S. v. A.C.B., ___ N.J. Super. ___, ___ (App. Div. 2026) (slip op. at 14) ("[W]e do not accord deference to legal conclusions, such as interpretations of a statute, which we review de novo." (citing C.R. v. M.T. (C.R. II), 257 N.J. 126, 139 (2024))). We consider the enforceability of that agreement to be a question of statutory interpretation and application of legislative policy—issues we view with fresh eyes.

At the risk of stating the obvious, the statute is entitled the Anti-Eviction Act for a reason. It protects tenants' rights by imposing burdens on the

27

landlord in a dispossess proceeding. As our Supreme Court explained in <u>447 Associates v. Miranda</u>, it is remedial legislation whose purpose was set out in the statement attached to the Act when it was proposed to the Assembly:

> At present, there are no limitations imposed by statute upon the reasons a landlord may utilize to evict a tenant. As a result, residential tenants frequently have been unfairly and arbitrarily ousted from housing quarters in which they have been comfortable and where they have not caused any problems. This is a serious matter . . . . This act shall limit the eviction of tenants by landlords to reasonable grounds . . . .
>
> [115 N.J. 522, 527 (1989) (quoting <u>Sponsors' Statement to A. 1586</u> (Apr. 16, 1974)).]

We recently reaffirmed that the Act should "be liberally construed to protect the rights of tenants, with all doubts resolved in favor of the tenant." <u>Fairkings Partners, LLC v. Daniels</u>, 482 N.J. Super. 520, 530 (App. Div. 2025) (quoting <u>Cashin v. Bello</u>, 223 N.J. 328, 336 (2015)), <u>certif. denied,</u> 264 N.J. 152 (2026).

Turning to substantive legal principles, the Act establishes several rights that are at the heart of this appeal. Notably, N.J.S.A. 2A:18-61.1 makes clear that a landlord cannot remove a residential tenant "except upon establishment of one of the [enumerated] grounds as good cause." The Act specifies—and thus limits—the grounds upon which a landlord may remove a residential tenant. <u>See</u> <u>Green v. Morgan Props.</u>, 215 N.J. 431, 447 (2013) ("[T]he clear purpose and spirit of the Anti-Eviction Act [is] to ensure that evictions are

based on 'reasonable grounds[.]'" (second and third alteration in original) (quoting 447 Associates, 115 N.J. at 529)). These grounds include, among others, failure to pay rent, disorderly behavior, or destruction or damage to the premises. N.J.S.A. 2A:18-61.1 (a), (b), (c).

PHA's eviction complaint specified two statutorily defined grounds. The first, set forth in N.J.S.A. 2A:18-61.1(d), permits eviction when the tenant

> has continued, after written notice to cease, to substantially violate or breach any of the landlord's rules and regulations governing said premises, provided such rules and regulations are reasonable and have been accepted in writing by the tenant or made a part of the lease at the beginning of the lease term.

The second, set forth in N.J.S.A. 2A:18-61.1(e)(1), permits eviction when the tenant

> has continued, after written notice to cease, to substantially violate or breach any of the covenants or agreements contained in the lease for the premises where a right of reentry is reserved to the landlord in the lease for a violation of such covenant or agreement, provided that such covenant or agreement is reasonable and was contained in the lease at the beginning of the lease term.

Each statutory ground includes material elements that must be proved, much like the elements of a criminal offense. It is not enough that some but not all elements embodied in a statutorily specified ground have been established to the requisite level of proof—preponderance of the evidence.

29

See 279 4th Ave. Mgmt., L.L.C. v. Mollett, 386 N.J. Super. 31, 37 n.3 (App. Div. 2006) ("[T]he plaintiff-landlord must prove all elements of the statutory ground alleged." (emphasis in original) (internal quotation marks and citation omitted)).

Here, the plain language of both grounds cited in the dispossess complaint requires the landlord not only to prove a violation of its rules and regulations (or of a covenant or agreement in the lease), but also to establish that the violation has continued and is substantial. See Diaz v. Perez-Tamayo, 251 N.J. Super. 513, 515 (Law. Div. 1991) ("There must be a substantial violation of the rules. That is, a considerable or significant breach—not a minor or trivial transgression." (emphasis in original)). Stated another way, when, as in this case, the ground cited for eviction in the complaint is N.J.S.A. 2A:18-61.1(d) or N.J.S.A. 2A:18-61.1(e)(1), the substantiality of the alleged violation(s) must either be proved at trial or by stipulation incorporated into the settlement agreement.

In sum, regardless of which enumerated eviction ground is relied on, the landlord must establish that the proven ground provides "good cause" for dispossession. See N.J.S.A. 2A:18-61.1 (a tenant cannot be removed "except upon establishment of one of the [enumerated] grounds as good cause" (emphasis added)). Absent a judicial finding that all elements have been

30                                                                              A-2424-25

established, N.J.S.A. 2A:18-61.1 flatly precludes a court from issuing a judgment for possession or warrant of removal.

IV.

Legal Effect of the Probation Agreement and a Violation Thereof

We next consider the legal impact of the settlement and Probation Agreement in this case. That inquiry is critical because the trial court's February 27, 2026 written order explicitly states that the judgment for possession was entered "for failure to comply with the terms of the parties' settlement agreement." The question, then, is whether and in what circumstances the failure to comply with a probation agreement is eviction-worthy conduct under the Act—that is, meets the irreducible prerequisite for eviction, which is "establishment of one of the [enumerated] grounds as good cause." N.J.S.A. 2C:2A:18-61.1.

We begin by reemphasizing that under the Act, no agreement can relieve PHA of its burden to establish that a breach, or pattern of breaches, is sufficiently substantial to establish good cause to evict. That is made clear by the provision in the Act that states, "Any provision in a lease whereby [a covered tenant] agrees that [their] tenancy may be terminated or not renewed for other than good cause as defined in [the Act] . . . shall be deemed against public policy and unenforceable." N.J.S.A. 2A:18-61.4.

31

By logical extension, the prohibition against waiving the good cause requirement in an agreement codified in the text of the lease also prohibits the parties from agreeing to disregard the good cause standard in a settlement agreement. Both the lease and Probation Agreement, after all, are types of contracts, and both thus necessarily include "provisions" on which the parties "agree" within the meaning of N.J.S.A. 2A:18-61.4. We would hardly be construing the act "liberally . . . with all doubts resolved in favor of the tenant," Daniels, 482 N.J. Super. 520 (quoting Bello, 223 N.J. at 336), if we were to hold that the Act's explicit limitations on what a landlord and tenant can agree to by way of waiving statutory protections could be circumnavigated through the artifice of a probation agreement incorporated into a settlement. See Cmty. Realty Mgmt., Inc. for Wrightstown Arms Apartments v. Harris, 155 N.J. 212, 227 (1998) ("[E]ntry of a consent judgment is inappropriate and the judgment itself is unenforceable when the agreement it encompasses or the relief it grants is illegal." (citations omitted)); Sacks Realty Co. v. Shore, 317 N.J. Super. 258, 269 (App. Div. 1998) ("It is well settled that the dictates of public policy may require invalidation of private contractual arrangements where those arrangements directly contravene express legislative policy . . . .").

However, while the good cause requirement cannot be waived by agreement, we do not mean to suggest that a settlement/probation agreement, properly drafted, cannot <u>satisfy</u> the good cause requirement under the Act. Incorporating conditions of "probation" into a settlement agreement can be mutually beneficial, and can work in a tenant's best interests by forestalling an all-but-certain judgment for possession. Accordingly, and consistent with the principle of construing the Act liberally in favor of tenants, the Act should not be interpreted to discourage much less categorically ban such agreements. <u>See Nolan by Nolan v. Lee Ho</u>, 120 N.J. 465, 472 (1990) (recognizing that "settlement of litigation ranks high in our public policy" and that courts should generally not vacate a settlement agreement "absent compelling circumstances" (internal quotation marks and citations omitted)).

As we have noted, in a contested case,[10] a landlord's burden of establishing good cause can be satisfied in either of two ways. First, good cause can be established by testimony or documentary evidence introduced by the landlord that proves all the material elements of one or more grounds for eviction alleged in the complaint. Alternatively, good cause can be established

---

[10] We do not address in this opinion the circumstances in which a judgment for possession may issue, consistent with the Act, when the tenant fails to respond or appear.

by an agreement of the parties that is ratified by the trial court. In this instance, that agreement would have required Ms. Hunt to explicitly acknowledge that her conduct substantially violated a lease provision or duly promulgated rule, and that the violation establishes good cause to order her eviction.

The Special Civil Part Rules already contain certain safeguards to ensure that consent or settlement-based judgments for possession are supported by good cause. Under Rules 6:6-4 and 6:6-3(b), any (1) consent judgment for possession or (2) settlement agreement that provides for entry of a judgment for possession must be accompanied by an affidavit of the landlord that "state[s] the facts establishing the jurisdictional good cause for eviction required by the applicable statute." R. 6:6-3(b).[11] These provisions were added to the Rules in 2001 following Harris, in which our Supreme Court expressed concern with the Rules at the time allowing tenants to enter consent judgments for possession without an affidavit or other factual stipulation that good cause under the Act had been satisfied. See 155 N.J. at 240. The Court

---

[11] Additionally, Rule 6:6-3(b) states, "If the basis for eviction requires service of a notice to quit, the landlord's affidavit must have a copy of all required notices attached, and the affidavit must state that the notices were served as required by law and that the facts alleged in the notices are true." Rule 6:6-4(a) also requires that settlement agreements and consent judgments for possession against unrepresented tenants be approved and signed by the court.

A-2424-25

noted that a tenant's mere assent to a consent judgment "provides the court with little or no meaningful assurance that [the Act's] jurisdictional conditions have been satisfied." Ibid.

As noted above, the settlement and Probation Agreement in the record before us do not include any affidavit or certifications setting forth the facts establishing good cause under the Act, and PHA does not contend that any affidavit was attached to the agreement when it was approved by the court. That defect alone is fatal to the judgment for possession and warrant of removal in this case.

Given the lack of express guidance in the text of the Act or interpretive case law on how to enforce a probation agreement like the one at issue here, we deem it appropriate to discuss the validity and enforceability of such agreements. We begin by noting that the Act has no provision expressly authorizing a court to place a tenant on probation or authorizing the parties to agree to probationary terms as part of a settlement agreement entered by the court.[12] Nor does the Act expressly authorize a process or proceeding analogous to the probation violation/revocation hearings well established in

---

[12] The word "probation" only appears in the Act to refer to probation in the criminal context, in provisions not relevant to this appeal. See N.J.S.A. 2A:18-61.1 (n), (p).

A-2424-25

the criminal justice system. Cf. N.J.S.A. 2C:45-1 (authorizing a court following a conviction to suspend the imposition of sentence) and N.J.S.A. 2C:45-3(a)(4) (authorizing a court to revoke or suspend probation and sentence or resentence a defendant who has "inexcusably failed to comply with a substantial requirement imposed as a condition of" probation). In the criminal justice setting, probation is a sentencing option or alternative that subjects the actor's conduct to heightened scrutiny during the probationary term, but is only imposed after there has been a trial verdict or guilty plea. With due regard to Lewis Carroll's satirical comment on judicial arbitrariness in Alice's Adventures in Wonderland,[13] a court should not impose a sentence, or suspend a sentence, until guilt has been established.[14] We do not mean to imply by this

---

[13]  "Sentence first—verdict afterwards" is the Queen of Hearts' famously inverted ruling made during the trial of the Knave of Hearts. Lewis Carroll, Alice's Adventures in Wonderland 187 (London, MacMillan & Co. 1866).

[14] We add that the structure of the present Probation Agreement is also similar in some respects to another criminal law feature—pretrial intervention (PTI). When a defendant is admitted to PTI, a charge is held in inactive status pending termination of the period of supervisory treatment, N.J.S.A. 2C:43-13(b), and upon successful completion of supervisory treatment, the charge may be dismissed with prejudice, N.J.S.A. 2C:43-13(d). Here, the Probation Agreement in like fashion provides that "[u]pon the conclusion of the probationary period, this agreement shall no longer be enforceable, and the [eviction] complaint shall be automatically dismissed."

But there is a significant distinction between PTI and the Probation Agreement before us. In the PTI setting, if the court finds after a summary

analogy that a landlord-tenant civil action for violation of a lease requirement to attend meetings and provide documents is comparable to a criminal prosecution.   We do believe, however, that as a matter of statutory interpretation and rudimentary due process, the Act requires a judicial finding (or an explicit tenant admission) of an eviction-worthy violation before the breach of a probation agreement can be the legal basis for a court-issued judgment for possession.   See Harris,155 N.J. at 240 (noting that a tenant's mere assent to a consent judgment "provides the court with little or no meaningful assurance that [the Act's] jurisdictional conditions have been satisfied").

The required judicial finding that there has been an eviction-worthy violation can be made before a probation agreement is entered, incorporated

---

hearing that the defendant violated a condition of supervisory treatment, the charges that were placed on inactive status may be reactivated.  See N.J.S.A. 2C:43-13(e).   That means the prosecution returns to square one, not that defendant is immediately sentenced upon the finding of a violation.  In cases involving certain serious crimes, admission to PTI is conditioned on the defendant entering a guilty plea, N.J.S.A. 2C:43-12(g)(3), and if the defendant is found to have violated a condition of supervisory treatment, the case may proceed to sentencing because guilt of the underlying offense has already been established.

The key point is that under the PTI program, as with probation, a person cannot be sentenced upon a violation absent a finding of guilt, whether by trial verdict or guilty plea.  So too in the present context, we hold that a tenant cannot be evicted unless and until there has been a judicial finding (or tenant admission) that the tenant committed an act warranting that remedy.

into the agreement, or made by a court afterwards in what would be the functional equivalent of a probation revocation hearing. But the critical principle we adhere to is that a judicial finding that the tenant committed an eviction-worthy violation—that is, a violation establishing good cause under the Act—must be made and placed on the record before a judgment for possession can be entered and a warrant of removal executed. That principle is unalienable and, pursuant to N.J.S.A. 2A:18-61.4 and "general considerations of public policy," cannot be waived. Sacks Realty Co., 317 N.J. Super. at 269.

Here, the record indicates that there was no meeting of the minds with respect to the legal significance of Ms. Hunt's conduct pertaining to the reexamination/recertification process. Ms. Hunt vigorously contested PHA's allegations of lease violations through PHA's informal and formal grievance processes, and to this day, there is no indication she ever admitted to substantially violating lease rules or covenants. Indeed, nothing in the text of the settlement agreement or incorporated Probation Agreement indicates that Ms. Hunt acknowledged she had breached the lease in any way, much less committed "continued," "substantial" violations that would constitute good cause to evict her. Tellingly, the model settlement agreement the parties used in this case includes a clause stating, "The tenant shall pay to the landlord $___, which the tenant admits is now due and owing." Settlement Agreement

(Tenant Remains), Pressler & Verniero, Current N.J. Court Rules, Appendix XI-V (2026) (emphasis added). Because the dispute here does not involve rent arrears, the parties crossed out this clause. However, they failed to replace it with an analogous provision in which Ms. Hunt admits to committing continued, substantial violations of lease rules or covenants. For that reason, the settlement and Probation Agreement, standing alone, cannot support a judgment for possession.

Nor does the record show that the trial court found the violations were substantial within the meaning of the two grounds cited in the dispossess complaint.[15] PHA does not contend that the trial court made any explicit substantiality findings, and, in fact, as we have noted, PHA confirmed at oral argument that the issue of whether Ms. Hunt's alleged breaches were

---

[15] We note in the interest of completeness that the governing federal regulations expressly prohibit the termination of a tenancy in a subsidized project except in the case of, in relevant part: "(1) [m]aterial noncompliance with the rental agreement, [or] (2) [m]aterial failure to carry out obligations under any state landlord and tenant act . . . ." 24 C.F.R. § 247.3(a). The federal regulations provide some guidance on when one or more substantial violations of the rental agreement, repeated minor violations of the rental agreement, or failure to supply required information on time constitute "material noncompliance" that would permit the termination of a tenancy. See 24 C.F.R. § 247.3(c); U.S. Dep't of Hous. & Urb. Dev., HUD Handbook No. 4350.3, Occupancy Requirements of Subsidized Multifamily Housing Programs § 7-8(D) (rev. Nov. 2013) (describing the landlord's rights and obligations when a tenant's untimeliness causes delays in the recertification process).

substantial for purposes of the Act was not even raised before the trial court. That acknowledgement is fatal to the judgment for possession before us considering that PHA carries the burden to establish the legal basis to evict under the Act.

In sum, we hold that under both the Act and the governing Court Rules, the settlement/Probation Agreement is missing a key component needed to make it an independently sufficient basis upon which to order Ms. Hunt's eviction. It failed to include an acknowledgment or admission by Ms. Hunt that her conduct satisfied the elements set forth in N.J.S.A. 2A:18-61.1(d) and/or (e)(1) as to constitute good cause within the meaning of the Act. Accordingly, even accepting for the sake of argument that she breached the terms of the Probation Agreement, any such violation of the agreement,[16] standing alone, is insufficient to justify a judgment for possession absent a judicial finding or ratification that Ms. Hunt at some point committed a substantial violation or violations constituting good cause to evict.

---

[16] We note that in this instance, the settlement agreement did not prescribe a rent or back-rent payment schedule, as none was needed. So far as the record reflects, there are no rent or subsidy arrearages in this case. This case, in other words, does not involve Ms. Hunt's failure to pay rent, N.J.S.A. 2A:18-61.1(a), or habitual late payment of rent, N.J.S.A. 2A:18-61.1(j). Rather, it involves what PHA describes as habitual failure to keep interview appointments and tender required documents.

## V.

### Opportunity to Cure Violations

As we noted in our introduction, there is an independent basis upon which to vacate the judgment for possession and warrant of removal in this case. For that reason, there is no need to remand for the trial court to make further findings of fact and conclusions of law on whether Ms. Hunt committed a substantial violation under the Act constituting good cause to evict.

Ms. Hunt argues that PHA acted in bad faith by "obstruct[ing]" her right to cure violations. While we do not agree that PHA acted in bad faith, we conclude that even if we were to assume for the sake of argument that Ms. Hunt committed substantial lease violations constituting good cause to evict, PHA—and the trial court—impermissibly denied her an opportunity to cure those violations. We emphasize that Ms. Hunt did not simply ignore PHA's efforts to arrange a meeting or its requests for documents. There was significant communication between the parties. The record shows that a month before the March 18, 2026 order to show cause hearing, Ms. Hunt informed PHA that she was prepared to attend its required meeting and provide required documents. Ms. Hunt maintains she had these documents prepared and

41

attempted to submit them on February 18, 2026, but PHA refused to meet with her or accept them.

In addressing the question of whether, in these circumstances, Ms. Hunt was entitled under the Act to cure the claimed violations and thereby forestall eviction, we find helpful guidance in our decision in Housing and Redevelopment Authority of the Township of Franklin v. Mayo, 390 N.J. Super. 425 (App. Div. 2007). In that case, a federally funded public housing authority sought to evict a tenant for permitting several unauthorized relatives to reside in her apartment, contrary to the lease. Id. at 426-27. The authority served notices to cease and quit, a demand for possession, and termination of the lease. The tenant ignored the notices and continued to allow her relatives to live with her. Id. at 427, 429. A month after the eviction complaint was filed and just two days before trial, the unauthorized relatives vacated the apartment. Id. at 427. The trial court then dismissed the complaint, holding that the tenant had cured the violation. Id. at 427. The authority appealed, arguing that the Act does not permit a tenant to cure this particular lease violation on the eve of a scheduled trial, and that if the Act does allow it, it is preempted by federal law. Id. at 430.

On appeal, we reversed the dismissal of the complaint and remanded the matter to the trial court "to determine whether an adequate cure for the breach

42

has occurred or can be established." Id. at 427. We began our analysis by noting that, unlike unpaid rent—which a tenant can cure even after trial by paying outstanding arrears—"not all causes for eviction can be completely cured." Id. at 433. For example, we noted, "[I]t would be absurd to rule that a tenant who knocks the landlord to the ground or threatens his life may not be evicted unless he does it again after receiving [notice]." Ibid. (first alteration in original) (quoting Muros v. Morales, 268 N.J. Super. 590, 596 (App. Div. 1993)).

We then determined that the breach at issue—permitting unauthorized persons to reside in one's apartment—"is somewhere between the failure to pay rent, which can be retroactively cured, and the examples we cited in Muros[17] where no cure should be permitted." Id. at 434. Specifically, we reasoned that the trial court's dismissal of the complaint, "after months of unauthorized lodging, frustrates the federal purpose of limiting scarce public housing to those that are truly eligible" and that "[s]imply vacating the premises does not erase the lengthy period of unauthorized lodging." Id. at 433-34. We added that "fraud by a public housing tenant, which constitutes material

---

[17] In Muros, the tenant had stolen electricity from the landlord. 268 N.J. Super. at 597. The Muros court held that certain grounds for eviction—including destruction or damage to the premises, assaultive or threatening behavior toward the landlord, and using or dispensing controlled dangerous substances (CDS)—are "not curable." Id. at 596.

43

noncompliance with the lease, may not be cured by mere discontinuance." Id. at 433 (citing Edward Gray Apartments/Region Nine Housing Corp. v. Williams, 352 N.J. Super. 457, 466 (App. Div. 2002)).

We also addressed the authority's contention that even if the Act permits a tenant to cure violations, federal law precludes a cure because federal interests were impaired by the violation. We rejected that argument, reasoning that federal law permits a tenant of federally funded public housing to rely on state law governing eviction procedures where such law provides the tenant procedural rights in addition to those provided by federal law. Id. at 432 (citing 24 C.F.R. § 247.6(c)). "Thus, federal public housing tenants can rely on this State's additional procedural protections, found in New Jersey's Anti-Eviction Act." Ibid.

Although we overturned the trial court order dismissing the authority's eviction complaint, we noted that the tenant could still adequately cure the breach by, for example, providing proof that the unauthorized residents were in fact eligible for public housing and would not have increased the unit's approved rent, or by reimbursing the authority for the losses and expenses that resulted from the unauthorized tenancy. Id. at 434. We therefore remanded the matter to the trial court to determine whether the tenant could provide "an adequate cure, which does not impair federal interests." Ibid.

44

Applying the reasoning in <u>Mayo</u> to the case before us, we believe Ms. Hunt was entitled to an opportunity to cure any outstanding violations of lease requirements related to her reexamination for zero-income housing. The present circumstances are significantly different from the situation in <u>Mayo</u>. In contrast to the <u>Mayo</u> tenant's "lengthy period of unauthorized lodging," <u>id.</u> at 434, nothing in the record indicates that Ms. Hunt spent even one day in the apartment as an unqualified recipient of housing assistance. Furthermore, in <u>Mayo</u>, we "emphasize[d]" that the authority had established a proper ground for eviction. <u>Ibid.</u> Here, in stark contrast, as we stressed in the preceding Section, there has been no such judicial finding.

More broadly, even accepting PHA's allegations that Ms. Hunt violated lease rules by missing meetings and failing to provide documents on time, that conduct is a far cry from the examples offered in <u>Mayo</u> and <u>Muros</u> where "no cure should be permitted." <u>Id.</u> at 434. Here, there was no proof of fraud, <u>cf.</u> <u>Edward Gray</u>, 352 N.J. Super. at 466, and as in past lease terms, we see no reason why PHA and the trial court could not have allowed Ms. Hunt to cure the missed meetings and deadlines by producing documents that demonstrate her eligibility for zero-income housing. That would have served—not impaired—the federal goal of verifying that she remains eligible for the zero-income subsidy.

45

We also embrace the holding in <u>Mayo</u> that federal law "permits [a] tenant of federally funded public housing to rely on State law governing eviction procedures where such law provides the tenant procedural rights in addition to those provided by federal law." <u>Id.</u> at 432 (citing 24 C.F.R. § 247.6(c)). Applying that principle, we are unpersuaded by PHA's federal preemption arguments, as federal law permits Ms. Hunt to exercise her right under the Act to cure lease violations in appropriate circumstances.

PHA nonetheless suggests that Ms. Hunt's last and only opportunity to cure the violations was by strictly complying with the Probation Agreement. We disagree for the reasons explained in the preceding Section. The strict compliance requirement that PHA proposes might be tenable if the trial court found that PHA had proved Ms. Hunt previously committed a substantial violation constituting good cause. But it did not.

Relatedly, PHA argues that its claim is analogous to an eviction action for habitual late payment of rent, <u>see</u> N.J.S.A. 2A:18-61.1(j), where an "established pattern" of late payment may be sufficient grounds for eviction even if each payment is eventually made. That may be so, but we are unmoved by this analogy where Ms. Hunt's alleged lease violations have never cost PHA a subsidy, and where <u>Mayo</u>—which concerns the cause of action at issue here—suggests that she was entitled to a cure.

46

In sum, we conclude that allowing Ms. Hunt to cure her noncompliance a month before the hearing would not have impaired PHA's or HUD's interests and would have advanced the rights safeguarded by the Act. That is especially so considering that Ms. Hunt—a single mother of a four-year-old—has a compelling interest in remaining in her apartment, and that in past years, PHA consistently permitted her to cure any breaches/violations with respect to attending meetings and producing documentation. Cf. NC Roseville Senior 2016 UR LLC v. Howard, 483 N.J. Super 113, 126 (App. Div. 2026) (reaffirming that when a landlord renews a tenant's lease and accepts rent under that new lease, it waives its right to terminate the tenancy based on the tenant's nonpayment of rent in the prior lease term).

## VI.

## Conclusion

Finally, we call attention to Ms. Hunt's resolute assertion that she is a tenant, not an inmate. We find that to be a poignant and insightful observation. It goes without saying that public housing facilities are homes, not prisons where vigorous enforcement of even minor rules sends a general deterrence message needed to maintain order and discipline.[18] When, as in this

---

[18] We do not mean to suggest that compliance with the federal regulations, PHA rules, and lease provisions at issue here is not important. Those

case, rent and subsidies have been paid and the rights of other tenants have not been jeopardized, courts should not impose the ultimate sanction of eviction reflexively when alternatives remain available under the Act that would ensure a proportionate response—one that balances and ultimately safeguards the interests of a housing authority, HUD, and a low- or zero-income tenant. See Daniels, 482 N.J. Super. at 530 (reaffirming that the Act is "'remedial legislation' and should 'be liberally construed to protect the rights of tenants, with all doubts resolved in favor of the tenant.'" (quoting Bello, 223 N.J. at 336)). Applying these foundational principles, we are constrained to reverse and vacate the judgment for possession and warrant of removal. We do so mindful that unless the pattern is broken, the parties may be back in court for the next reexamination/recertification cycle. We offer no opinion on whether Ms. Hunt is eligible for zero-income housing assistance.

To the extent we have not specifically addressed them, any remaining arguments made by the parties are either rendered moot by our resolution of

requirements serve the critical federal purpose of "limiting scarce public housing to those that are truly eligible." Mayo, 390 N.J. Super. at 433. In serving the interests of justice, however, courts must acknowledge the distinction between means and ends. While keeping scheduled appointments, for example, is an important part of the reexamination/recertification process, that requirement is not an end unto itself but rather a means to ensure that only qualified tenants receive public housing assistance.

the central issues or else lack sufficient merit to warrant discussion in a written opinion.  See R. 2:11-3(e)(1)(E).

Reversed and remanded for the trial court to vacate the judgment for possession and warrant of removal.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Harley

Clerk of the Appellate Division